1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   INTERNATIONAL ORGANIZATION OF          No. C 06-2107-CW
     MASTERS, MATES AND PILOTS, PACIFIC
13   MARITIME REGION,                       No. C 06-2152-CW
                                            (RELATED CASE)
14            Plaintiff,

15        v.                                ORDER ON
                                            PLAINTIFFS'
16   NATIONAL PARK SERVICE, et al.,         MOTIONS FOR
                                            PRELIMINARY
17            Defendants.                   INJUNCTION

18   _____/

19   INLANDBOATMEN'S UNION OF THE PACIFIC,
     MARINE DIVISION, ILWU,
20
              Plaintiff,
21
          v.
22
     FRAN MAINELLA, et al.,
23
              Defendants.
24
     _____/

25

26        Plaintiffs International Organization of Masters, Mates and

27   Pilots, Pacific Maritime Region (MM&P) and Inlandboatmen's Union of

28   the Pacific, Marine Division, ILWU (IBU) separately move for

preliminary injunctions, seeking to stop Defendants National Park Service (NPS) and NPS Director Fran Mainella from awarding a concession contract to Intervener Hornblower Yachts.  Plaintiffs contend that this contract would violate the 1965 McNamara-O'Hara Service Contract Act (SCA), 41 U.S.C. § 351.[1]  Defendants and Intervener oppose these motions.  The matter was heard on April 28, 2006.  On May 1, 2006, the Court, for the reasons expressed in this order, granted Plaintiff MM&P's motion, granted in part Plaintiff IBU's motion and stayed the case.

<div align="center">BACKGROUND</div>

Over a million visitors flock to Alcatraz Island each year; ferries shuttle those visitors to and from the island.  Currently, under a 1983 contract (the original concession contract), Blue & Gold Fleet provides transportation services to and from Alcatraz Island.  Pursuant to the Concessions Policy Act of 1965, Public Law 89-249, 79 Stat. 969 (the 1965 Concessions Act), the original concession contract was entered into by Defendant NPS and Harbor Carrier, Inc., for the fifteen year period beginning January 1, 1984, and ending December 31, 1998.  Approximately a year and a half before the contract was due to expire, it was assigned to Blue & Gold Fleet.

Before the original concession contract expired, Congress enacted the National Park Service Concessions Management

_____

[1]The SCA requires contractors to pay their service employees "in accordance with prevailing rates for such employees in the locality" as determined by the Department of Labor, or "where a collective bargaining agreement covers such service employees, in accordance with the rates . . . provided for in [that] agreement." 41 U.S.C. § 351(a)(1).

<div style="writing-mode: vertical-rl">**United States District Court**
For the Northern District of California</div>

United States District Court

For the Northern District of California

Improvement Act of 1998 (the 1998 Concessions Act), which repealed the 1965 Concessions Act and established "a new, comprehensive concession management program."  S. Rep. No. 105-202, at 20 (1998).  Unlike the 1965 Concessions Act, the 1998 Concessions Act requires that concession contracts be awarded on a competitive basis to the entity submitting the best proposal.  The 1998 Concessions Act instructs that, in selecting the best proposal, the following factors must be considered: (1) the responsiveness of the proposal to the objectives of protecting and preserving park resources and of providing services to the public at reasonable rates; (2) the experience and related background of the entity submitting the proposal; (3) the financial capability of the entity submitting the proposal; and (4) the proposed franchise fee, although the consideration of revenue is to be subordinate to the objectives of protecting and preserving park resources and of providing services to the public at reasonable rates.  Id. at 30; 16 U.S.C. § 5952(5)(A).  In addition, the 1998 Concessions Act requires that any proposed concession contract with anticipated annual gross receipts in excess of five million dollars, or a duration of more than ten years, must be submitted to Congress at least sixty days before it is awarded.  16 U.S.C. § 5952(6).

The original concession contract was extended under the 1998 Concessions Act.  The contract requires that, upon the request of Defendant NPS, Blue & Gold Fleet continue to conduct operations for a reasonable time to allow selection of a successor.  Blue & Gold Fleet has accepted Defendant NPS's requests for extensions and continuations of service.  The contract is now due to expire on May

3

**United States District Court**
For the Northern District of California

31, 2006.  According to Blue & Gold Fleet's Executive Vice President, the company is willing and able to continue providing ferry service to Alcatraz Island as it has since 1997.

On July 27, 2004, Defendant NPS issued a solicitation seeking proposals for a new ten-year concession contract for transportation and other visitor services for Alcatraz Island.  The solicitation and the draft of the new concession contract attached to it did not contain any information specifying minimum wages and fringe benefits for service employees or any other information concerning wages and benefits that would be required by the SCA.  Instead, the solicitation stated that it was being issued pursuant to the authority of the 1998 Concessions Act and its implementing regulations, 36 C.F.R. Part 51, and included a copy of the regulations.  Among the implementing regulations is 36 C.F.R. § 51.3, which provides, "Concession contracts are not contracts within the meaning of 41 U.S.C. 601 et seq. (the Contract Disputes Act) and are not service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions."

The solicitation also included instructions directing offerors to submit comments to Defendant NPS in writing no later than thirty days prior to the due date for proposals if they believed any statement in the solicitation to be inaccurate.  No offerors did. The instructions also directed that, if offerors did not understand something in the solicitation, they should submit questions in writing to Mr. Lee Shenk.  Although Mr. Shenk received several

4

United States District Court

For the Northern District of California

written questions prior to the deadline set for submission of such questions, none of those questions concerned the SCA or wages and benefits required under the new concession contract.

Four proposals were submitted, including one from Blue & Gold Fleet.  In September, 2005, Defendant NPS announced that Intervener's proposal had been selected as the best proposal received.

On November 15, 2005, Blue & Gold Fleet filed in the United States Court of Federal Claims a pre-award protest of the selection of Intervener for the new concession contract.  Among the issues raised was whether the SCA applied to the contract.  On November 17, 2005, the court allowed Intervener to intervene in that case. Two months later, the court allowed Plaintiffs to file amicus briefs in support of Blue & Gold Fleet.

On November 30, 2005, Plaintiffs sent a joint letter to the Department of Labor (DOL), requesting a formal determination of whether the SCA applies to the proposed contract with Intervener. On January 6, 2006, DOL's Wage and Hour Division issued a letter to Defendant Mainella, stating that "the SCA applies to all contracts entered into by the United States or the District of Columbia that are principally for the furnishing of services through the use of service employees."  Preliminarily finding that the SCA applies to the contract in question, the DOL ordered Defendant NPS to provide it "with the reasons for not including SCA" in the contract "within 21 days of the date of this letter."  Defendant NPS did not do so; instead, it requested an extension until March 31, 2006.  On April 7, 2006, Defendant NPS responded to the DOL's letter,

asserting that "NPS concession contracts are governed exclusively by the NPS Concessions Management Improvement Act of 1998, and that the SCA does not apply" to the new concession contract.

On March 6, 2006, the Federal Claims Court issued its decision in <u>Blue & Gold Fleet v. United States</u>; the court granted Defendant NPS and Intervener's motions for judgment on the administrative record and dismissed Blue & Gold Fleet's protest.  The court did not reach the merits of Blue & Gold Fleet's SCA claim, finding that Blue & Gold Fleet had waived its SCA claim by failing to raise it before submitting a proposal in response to the solicitation.  That same day, Blue & Gold Fleet appealed the court's order.  It also filed motions in the Court of Federal Claims and the Federal Circuit for injunctions pending appeal to enjoin NPS from awarding the new concession contract.  The motion was denied by the Court of Federal Claims; the motion in the Federal Circuit is still pending.

After the Federal Claims Court issued its judgment, Defendant NPS submitted the proposed new concession contract to Congress pursuant to 16 U.S.C. § 5952(6).  The sixty-day notification period expired on May 7, 2006, and, if Defendant NPS were not enjoined, it would have been able to award the new concession contract to Intervener.

Plaintiffs are Unions; their members include employees of Blue & Gold Fleet.  Intervener's employees, however, are not unionized, and Intervener has no obligation under the new concession contract to pay its employees the same wages, or provide the same benefits, that were provided to Blue & Gold Fleet's employees under the original concession contract.  According to Plaintiffs, awarding

United States District Court
For the Northern District of California

the new concession contract, without requiring that the contractor

comply with the SCA, will result not only in the loss of jobs and

income for their members, but will also depress area wage and

benefit standards in the entire maritime industry in California.

LEGAL STANDARD

To obtain a preliminary injunction, the moving party must

establish either: (1) a combination of probable success on the

merits and the possibility of irreparable harm, or (2) that serious

questions regarding the merits exist and the balance of hardships

tips sharply in the moving party's favor.  Rodeo Collection, Ltd.

v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

The test is a "continuum in which the required showing of harm

varies inversely with the required showing of meritoriousness."

Id. (quoting San Diego Comm. Against Registration & the Draft v.

Governing Bd. of Grossmont Union High Sch. Dist., 790 F.2d 1471,

1473 n.3 (9th Cir. 1986)).  The moving party ordinarily must show

"a significant threat of irreparable injury," although there is "a

sliding scale in which the required degree of irreparable harm

increases as the probability of success decreases,"  United States

v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174, 175 (9th Cir.

1987), and vice versa.  To overcome a weak showing of merit, a

plaintiff seeking a preliminary injunction must make a very strong

showing that the balance of hardships is in its favor.  Rodeo

Collection, 812 F.2d at 1217.

DISCUSSION

Plaintiff MP&P seeks a preliminary injunction barring

Defendants NPS and Mainella from awarding a new concession contract

7

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

to Intervener that violates the SCA by allowing Intervener to pay less than the wages and benefits specified in MM&P's collective bargaining agreement with the predecessor contractor, Blue & Gold Fleet.  Plaintiff IBU seeks a broader injunction.  It seeks to enjoin Defendants (1) from awarding any NPS concession contracts, the principle purpose of which is to furnish transportation services, in response to a solicitation that does not expressly set forth the applicability of the SCA; and (2) from allowing any contractor on any concession contract, the principle purpose of which is to provide transportation services, to pay their employees wages and fringe benefits lower than those required by the SCA.  Defendants and Intervener contend that Plaintiffs are not entitled to relief.

I.  Standing

        Defendants argue that Plaintiffs lack standing to bring these suits because they are not within the zone of interest to be protected by the SCA.  But, as Plaintiffs note, this argument ignores the specific injuries Plaintiffs claim and controlling Ninth Circuit case law.  Unlike in other cases cited by Defendants, Plaintiffs here are not merely claiming lost jobs.  Instead, they have alleged that by refusing to apply the SCA to the new concession contract, Defendant NPS has proximately caused injury and will continue to threaten to injure both Plaintiffs and their members by: (1) depriving them of the SCA's protections against wage-slashing competition that would, otherwise, substantially reduce their current job security; (2) denying them the opportunity to keep their jobs with Blue & Gold Fleet by having their current

8

wage compensation package serve as the uniform standard for
prospective contractors as required by the SCA; (3) denying them
the opportunity to compete for and retain their job duties with
Intervener without suffering a decrease in wages and benefits; and
(4) depressing the area standards that Plaintiffs have struggled to
secure through collective bargaining and thereby undermining
Plaintiffs' bargaining power and ability to represent their members
effectively in future collective bargaining with other maritime
employers in the San Francisco Bay Area.

In <u>International Longshoremen's and Warehousemen's Union v.</u>
<u>Meese</u>, 891 F.2d 1374, 1377 (9th Cir. 1989), the Ninth Circuit held
that the government's failure to require a third-party employer to
comply with federal law proximately caused injury to the union and
its members by denying them "the opportunity to compete" for
similar work, and thus the union had standing to challenge the
government's failure to enforce the law.  Plaintiffs claim the same
type of injury here.  According to Plaintiffs, they were denied the
opportunity to compete with others on wage terms which all federal
contracts must observe under the SCA but which the government, as
in <u>ILWU</u>, refuses to enforce; thus, they too have standing.
Defendants attempt to distinguish <u>ILWU</u>, noting that, there, the
court found that the plaintiffs came within the zone of interest of
the Immigration and Naturalization Act, not the SCA.  Their
attempt, however, fails.  Although different statutes are involved,
the holding in <u>ILWU</u> is applicable to this case.

The Ninth Circuit has instructed that the zone of interest
test "is to be construed generously," and "a court should deny

United States District Court

For the Northern District of California

standing under the 'zone of interest' test only 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" City of Sausalito v. O'Neill, 386 F.3d 1186, 1200 (9th Cir. 2004) (quoting Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 399 (1987)).

As explained in American Federation of Government Employees, Local 1668 v. Dunn, 561 F.2d 1310 (9th Cir. 1977),

> The legislative history reveals that the Service Contract Act was passed in reaction to Congress' finding that a depressed wage level prevailed in private service employment.  These service employees were not covered, in many instances, by the Fair Labor Standards Act or by state minimum wage rates, resulting in a situation where contractors paying the lowest wage would secure most government jobs.  Congress, feeling that in this way "the Government is in effect subsidizing subminimum wages," passed the Service Contract Act to insure "that the Federal Government shall not be a party to the depressing of labor standards in any area of the nation."  The purpose statement of the Service Contract Act states: "The purpose of this bill is to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies."

561 F.2d at 1312 (citations omitted).  In AFGE, the court found that the plaintiff did not have standing under the SCA because the service employees it represented were government employees, not "employees of contractors and subcontractors." Id.  There, the plaintiff's interests were different from the purpose of the SCA, which was enacted explicitly for the benefit of employees of contractors and subcontractors.  In arguing that Plaintiffs do not have standing under AFGE, Defendants fail to note that, unlike the plaintiff in AFGE, Plaintiffs here represent employees of contractors.  Instead, Defendants argue that to have standing a

plaintiff must be an employee of the successor contractor whose wages or other benefits are below what is required under the SCA. AFGE, however, does not support that argument.

Defendants cite no case from this circuit holding that a union representing employees of a current federal contractor lacks standing to sue for application of the SCA to a contract for services, being performed by its members for the government, that is now subject to re-bidding.  The out-of-circuit cases that Defendants cite are distinguishable.  For example, in National Maritime Union of America v. Commander, Military Sealift Command, 824 F.2d 1228, 1235 (D.C. Cir. 1987), the court specifically noted that the unions, which represented government employees and not employees of private-sector federal contractors, did not allege as injury any threat that the winning contractor would pay less than the prevailing wages and benefits under the SCA: "Indeed, the Unions could not allege any such injury in this case, since the contract specifically requires [the contractor] to pay, retroactive to the date of the award, whatever wages and benefits the Secretary ultimately determines to be 'prevailing.'"

Plaintiffs have standing to seek injunctive relief requiring Defendants to apply the SCA to the new concession contract. Defendants' actions have allegedly caused Plaintiffs and their members injury which is likely to be redressed by a favorable decision from the Court.  See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998).  And, when the zone of interest test is construed

11

United States District Court

For the Northern District of California

1   generously as the Ninth Circuit requires, Plaintiffs, whose members

2   include service employees the SCA was enacted to protect, are

3   within the zone of interest protected by the SCA.

4   II.   Time-Barred

5        Defendants argue that Plaintiffs' challenge to 36 C.F.R.

6   § 51.3, which provides that laws such as the SCA do not apply to

7   NPS concession contracts, is time-barred under either 28 U.S.C.

8   § 1658 (four-year statute of limitations) or 28 U.S.C. § 2401(a)

9   (six-year statute of limitations).  As Defendants note, this

10  regulation was promulgated in the Federal Register on April 17,

11  2000, and a similar regulation, which existed until it was replaced

12  by 36 C.F.R. § 51.3, was promulgated in 1982.

13       Claims challenging specific application of an unlawful

14  regulation accrue at the time the regulation is actually applied,

15  not when the regulation was first promulgated.  See Wind River

16  Mining Corp. v. United States, 946 F.2d 710, 713 (9th Cir. 1991);

17  Natural Res. Def. Council, Inc. v. Evans, 279 F. Supp. 2d 1129,

18  1148 (N.D. Cal. 2003).  The solicitation for the new concession

19  contract was issued on July 27, 2004.  Thus, Plaintiffs' challenge

20  is not time-barred.

21  III.  Res Judicata

22       Intervener argues that, as a result of the judgment entered by

23  the Court of Federal Claims in Blue & Gold Fleet v. United States,

24  Plaintiffs' claims are barred by res judicata.  The claims in this

25  case and in Blue & Gold Fleet v. United States arise from "the same

26  transactional nucleus of facts," namely, the solicitation, bidding

27  and award of the new concession contract.  Tahoe-Sierra Pres.

28                                  12

United States District Court

For the Northern District of California

Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F.3d 1064, 1078 (9th Cir. 2003).  Intervener notes that the Ninth Circuit has found that, for purposes of applying collateral estoppel or res judicata, courts are "no longer bound by rigid definitions of parties or their privies."  United States v. ITT Rayonier, Inc., 627 F.2d 996, 1003 (9th Cir. 1980).  Plaintiffs may be bound by the court's judgment if they "had a sufficient interest and participated in the prior action."  Id.

Intervener points out that Plaintiffs had a sufficient interest and that they participated as amici in Blue & Gold Fleet's protest in the Court of Federal Claims.  Thus, Intervener argues that Plaintiffs should be bound by that judgment.

Certainly, Plaintiffs had an interest in the prior action. However, it cannot be said that they participated in the action merely by submitting amicus briefs.  As the Ninth Circuit explains, "We deny preclusive effect, in general, when the adjudicator lacks jurisdiction to determine an issue, when the parties lacked an adequate opportunity to litigate an issue, or when some other aspect of due process, the 'full and fair opportunity' to litigate, is missing."  Miller v. County of Santa Cruz, 39 F.3d 1030, 1038 (9th Cir. 1994).  Plaintiffs could not have joined as a party to Blue & Gold Fleet's pre-award protest because jurisdiction to challenge a bidding process is limited to "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by the failure to award the contract."  Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (holding that, because they were not

13

actual or prospective bidders, unions lacked standing to bring bid protest actions in the Court of Federal Claims).  Plaintiffs did not have a full and fair opportunity to litigate whether the SCA applied to the new concession contract.  The court rejected Blue & Gold Fleet's SCA claim without reaching the merits; the court found that Blue & Gold Fleet waived its SCA claim by not raising the issue before submitting its proposal.

There is no indication that Blue & Gold Fleet was acting on behalf of Plaintiffs in the Federal Claims Court action.  See FTC v. Garvey, 383 F.3d 891, 898 (9th Cir. 2004).  Blue & Gold Fleet sought to prevent the new concession contract from being awarded to Intervener because it wanted the contract.  Plaintiffs seek to ensure that area wage and benefits standards are maintained regardless of who is awarded the contract.  Res judicata does not bar Plaintiffs from bring their claim before this Court.

IV.  Other Proceedings

Defendants and Intervener contend that this case is currently being reviewed by the Federal Circuit, Congress and the DOL.  They urge the Court to defer ruling on the motions for preliminary injunction and to stay these proceedings.

As discussed above, however, this case is not before the Federal Circuit.  Plaintiffs are not parties in the case before the Federal Circuit and Blue & Gold Fleet does not represent their interests.  The Federal Circuit, like the Court of Federal Claims, may not even address the merits of whether the SCA applies to the new concession contract; instead, it too could focus only on Blue & Gold Fleet's timeliness in raising that argument.  Staying this

14

action pending the Federal Circuit's ruling, without a preliminary injunction, would allow Defendants to award the new concession contract to Intervener.

Nor is this case before Congress.  Although 16 U.S.C. § 5952(6) requires that proposed concession contracts be submitted to two Congressional committees sixty days before the contracts can be awarded, that statute does not provide that those committees will review the contracts to ensure that they comply with other statutes, such as the SCA.  The sixty day period has passed.

This case, however, is before the DOL.  As noted above, the DOL issued a preliminary determination that the SCA applies to the concession contract.  But Defendants and Intervener provide no reason to defer ruling on the motions for preliminary injunction until the DOL issues its final determination.  A stay pending the DOL's decision, without ruling on the motions, would be inconsistent with the DOL's preliminary ruling.  Furthermore, by submitting their response over two months after the DOL requested it, Defendants have delayed the DOL's final ruling.  Plaintiffs should not have to suffer irreparable and imminent harm while waiting for completion of the DOL's review, which might have been completed had Defendants timely filed their response.  See Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 499 (9th Cir. 1980) (judicial intervention is appropriate where administrative remedies are inadequate, futile or where irreparable injury will result unless immediate judicial review is permitted).

For these reasons, the Court, in its May 1, 2006 order, stayed this case pending the DOL's determination of whether the SCA

United States District Court
For the Northern District of California

applies to the concession contract at issue.  During the stay, however, the preliminary injunction will be in effect.

V.   Merits

Plaintiffs contend that they are likely to succeed on the merits.  According to Plaintiffs, the new concession contract, like all concession contracts involving transportation, is subject to the SCA; thus, 36 C.F.R. § 51.3, as interpreted and applied, is arbitrary, capricious and unlawful.

Enacted in 1965, the SCA states that it applies to "[e]very contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in section 356 of this title, whether negotiated or advertised, the principal purpose of which is to furnish services in the United States through the use of service employees."  41 U.S.C. § 351.  The SCA provides that the Secretary of Labor may make regulations allowing reasonable exemptions to and from any and all provisions of the Act, but only when the Secretary determines that such exemptions are necessary and proper in the public interest.  41 U.S.C. § 351.

Three years after the statute's enactment, the DOL issued the following regulation:

> It is not considered that the Act was intended to cover every contract, however, which is entered into with the Government by a contract to furnish services, no matter how indirect or remote a benefit the Government may derive therefrom.  If, for example, a contract with the Government grants the Contractor the privilege of operating as a concessionaire in a Government park for the purpose of furnishing services to the public generally rather than to the Government or to personnel engaged in its business, the contract is not considered subject to the Act.

United States District Court

For the Northern District of California

1    33 Fed. Reg. 9880, 9891 (July 10, 1968).

2        In 1983, however, the DOL revised that regulation.  It now

3    provides:

4        The Department of Labor, pursuant to section 4(b) of the
         Act, exempts from the provisions of the Act certain kinds
5        of concession contracts providing services to the general
         public, as provided herein.  Specifically, concession
6        contracts (such as those entered into by the National
         Park Service) principally for the furnishing of food,
7        lodging, automobile fuel, souvenirs, newspaper stands,
         and recreational equipment to the general public, as
8        distinguished from the United States Government or its
         personnel, are exempt.  This exemption is necessary and
9        proper in the public interest and is in accord with the
         remedial purpose of the Act.  Where concession contracts,
10       however, include substantial requirements for services
         other than those stated, those services are not exempt.

11   29 C.F.R. § 4.133(b).

12       Here, there is no dispute that the new concession contract is

13   in excess of $2,500.  Nor is there a dispute that its principal

14   purpose is to furnish services in the United States.  The

15   solicitation provides that it seeks a contractor to provide

16   "transportation service," "computerized reservation and ticketing

17   service," and maintenance of dock and other facilities.  This is

18   not a contract for "the furnishing of food, lodging, automobile

19   fuel, souvenirs, newspaper stands, and recreational equipment to

20   the general public."  Id.

21       Nonetheless, Defendants and Intervener argue that, pursuant to

22   Defendant NPS's regulation, the SCA does not apply to the new

23   concession contract or any concession contract.  To justify

24   Defendant NPS's regulation, Defendants point to language in the

25   SCA's non-codified preamble, which states that the purpose of the

26   SCA is "to provide labor standards for the protection of employees

27

28                                    17

of contractors and subcontractors furnishing services to or
performing maintenance service for Federal agencies." 1965
U.S.C.C.A.N. 3737. They emphasize "furnishing services to . . .
Federal agencies," noting that concessionaires furnish services to
the public. This language, however, was not incorporated into the
statute. Instead, as noted above, the SCA provides that it applies
to contracts "the principal purpose of which is to furnish services
in the United States through the use of service employees." 41
U.S.C. § 351.

The Supreme Court instructs that "when the statute's language
is plain, the sole function of the courts -- at least where the
disposition required by the text is not absurd -- is to enforce it
according to its terms." Lamie v. United States Trustee, 540 U.S.
526, 534 (2004) (citations omitted). Here, the language of the SCA
is plain. Thus, the Court need not, and cannot, rely on the
preamble to interpret the SCA. Price v. Forrest, 173 U.S. 410, 427
(1899); see also Norman J. Singer, Sutherland Stat. Constr. § 47.04
(5th ed. 1992) ("while the preamble of the act can be used for the
purpose of explaining otherwise unclear legislative intent, it does
not control when the statutory language has plain and obvious
meaning").

Furthermore, Plaintiffs note that the new concession contract,
like the original concession contract, is a "hybrid" contract,
requiring services to be provided to the public and to Defendants.
For example, Defendant NPS's employees can get to Alcatraz Island
only through the concessionaire's services. Under the current
contract, Blue & Gold Fleet transports Defendant NPS personnel,

18

United States District Court

For the Northern District of California

equipment, material, supplies and potable water to the island, and hauls all sewage and trash from the island.  At the hearing, Defendants stated that the new concession contract requires fewer such services and that the services provided to Defendant NPS will be minimal.  Regardless, even if Defendants and Intervener are correct that the SCA applies only to contracts that furnish services to federal agencies, serious questions exist regarding whether the SCA applies to the new concession contract.

As noted above, it has been the view of the DOL for over two decades that the SCA applies to NPS contracts, with limited exceptions not relevant here.  Congress delegated the responsibility to interpret the SCA to the DOL, not to Defendant NPS.  See Chevron U.S.A, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984) (deference must be given to the agency to which Congress has delegated the responsibility to interpret the law and draft regulations pursuant to that law).  Thus, it is the DOL's interpretation of the SCA that is entitled to deference, not Defendant NPS's.  Smith v. City of Jackson, 544 U.S. 228, 125 S. Ct. 1536, 1558-59 (2005)(O'Connor, J., concurring) (noting that "Congress has explicitly or implicitly delegated to the agency responsible for administering a statute the authority to choose among permissible constructions of ambiguous statutory text" and applying contradictory interpretations from other agencies would be contrary to such delegation).  Defendants cannot render the SCA inapplicable to concession contracts by implementing their own contrary regulation, a "regulation" that the Supreme Court found to be "nothing more than a 'general statement of policy' designed to

19

1  inform the public of NPS's views."  <u>National Park Hospitality Ass'n</u>

2  <u>v. Dep't of Interior</u>, 538 U.S. 803, 809 (2003)(holding that a

3  challenge to 36 C.F.R. § 51.3, purporting to render the Contract

4  Disputes Act of 1978 inapplicable to concession contracts, was not

5  ripe for judicial resolution).

6      Considering the plain language of the SCA and deference to

7  DOL's regulation on the scope of the SCA, the Court finds that it

8  is likely that Plaintiffs will succeed on the merits in showing

9  that the SCA applies to the new concession contract.

10 VI.  Imminent and Irreparable Harm

11     Plaintiffs list numerous injuries that they and their members

12 will suffer if an injunction is denied and Defendants award the new

13 concession contract to Intervener, as planned, on or about May 7,

14 2006.  Plaintiff MP&P states that more than 150 of its members will

15 lose their jobs without an opportunity to compete for those jobs on

16 equal footing with non-union employers and their employees.  The

17 new contract will depress wages for union members in the entire

18 maritime industry in Northern California, undermining the current

19 level of wages and benefits provided to union members.  In

20 addition, Plaintiff MP&P provides declarations of its members

21 attesting to the irreparable harm that they and their families will

22 suffer unless the award of the new concession contract is

23 preliminary enjoined.

24     Defendants contend that the only harm to Plaintiffs is

25 monetary.  Without providing any authority, Defendants argue that

26 such monetary damages will not support injunctive relief.

27 Plaintiffs' harm, however, is not measurable entirely in monetary

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

terms.  As shown in the declarations, Plaintiffs' members face substantial hardships, including the break-up of families and the inability to preserve necessary health care; if unable to find employment with similar wages and benefits, many members may be forced to leave their homes in the Bay Area.  Furthermore, courts have found the injuries Plaintiffs claim sufficient to warrant a preliminary injunction.  In <u>American Maritime Officers v. Hart</u>, 1999 WL 33839612, *5 (D. D.C. 1999), the court granted the plaintiff union's motion for preliminary injunction and enjoined a federal agency from awarding a contract pursuant to a solicitation that failed to comply with the SCA.  In <u>Whelan v. Colgan</u>, 602 F.2d 1060, 1062 (2d Cir. 1979), the court found that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury." <u>See also</u> <u>Roe v. Anderson</u>, 966 F. Supp. 977, 985 (E.D. Cal. 1997) (finding irreparable harm where enforcement of law made it impossible to find affordable housing in California).

Intervener does not attest to any harm it will suffer. Defendants assert that delay and uncertainty may cause difficulties for Intervener.  But, as Plaintiffs note, the absence of any claim of harm by Intervener itself undermines that assertion.  Plaintiffs further note that there is no compelling urgency to award the new concession contract.  The solicitation for the contract has been pending since June 27, 2004, and Defendants twice extended the deadline for submission of proposals.  Furthermore, Blue & Gold Fleet is willing to continue under the original concession contract as long as necessary; service to Alcatraz would not be interrupted

**United States District Court**

For the Northern District of California

1    if the Court were to grant a preliminary injunction.

2        Absent the injunction Plaintiff MP&P seeks, Plaintiffs'

3    members likely will be imminently and irreparably harmed.  Absent

4    the broader injunction sought by Plaintiff IBU, harm is not

5    imminent.  Plaintiff IBU cites no other concession contract for

6    transportation services that is on the verge of being awarded.  Its

7    only members in imminent danger of losing their jobs, health care

8    and homes are those members currently working for Blue & Gold

9    Fleet; any immediate and irreparable harm to those members would be

10   addressed by enjoining only the new concession contract.

11   VII.  Public Interest

12       The parties note that, in ruling on a preliminary injunction,

13   courts consider "whether the public interest will be advanced by

14   granting the preliminary relief."  Overstreet v. United Bhd. of

15   Carpenters and Joiners of Am., Local Union No. 1506, 409 F.3d 1199,

16   1207 (9th Cir. 2005).  Plaintiffs contend that, here, the public

17   interest would be advanced by the preliminary injunctions.  They

18   note that the SCA furthers a compelling public interest in

19   protecting wages and benefits of service contract employees and

20   ensuring "that the Federal Government shall not be a party to the

21   depressing of labor standards in any area of the nation." AFGE,

22   561 F.2d at 1312 (quoting 11 Cong. Rec. 24387, 1965, Cong. O'Hara,

23   co-author of the SCA).  They further note that there is a strong

24   public interest in ensuring that federal agencies comply with

25   federal law.

26       Intervener and Defendants do not address the public interests

27   Plaintiffs cite.  Instead, Intervener responds that the public's

28                                    22

United States District Court

For the Northern District of California

interest is in uninterrupted service to Alcatraz Island, particularly during the peak summer tourist season, and that an injunction would impede this interest.  According to Intervener, if the Court grants this injunction, Defendants will be forced to scramble to find alternative services.  But, as noted above, the incumbent contractor, Blue & Gold Fleet, has expressed its willingness to continue providing ferry services to Alcatraz. Defendants respond that, if they are enjoined, the public and the park will be denied the benefits described in Intervener's proposal.  Neither Defendants nor Intervener, however, offer any evidence of potential harm to the park or public.  Nor do they state what benefits to the public will be denied.

Although it is not clear that the public interest will be advanced by granting Plaintiffs' preliminary injunctions, neither does it appear that the public interest will be harmed.

CONCLUSION

For the foregoing reasons, during the pendency of this litigation, Defendants are enjoined from awarding a contract, for the continuation of water transportation services between the City of San Francisco, California and Alcatraz Island and related services, that permits any contractor or subcontractor under it to pay its employees providing services under such contract less than the wages and fringe benefits specified in Plaintiffs' collective bargaining agreements with Blue & Gold Fleet, LLP, including any prospective increases in wages and fringe benefits specified in such collective bargaining agreements.  As explained in the Court's May 1, 2006 order, this injunction does not prevent a contractor or

23

**United States District Court**
For the Northern District of California

1  subcontractor from seeking a variance from the Department of Labor.

2  If a variance is granted, Defendants may move to vacate the

3  preliminary injunction.

4       This case is stayed pending the Department of Labor's

5  determination of whether the SCA applies to the concession contract

6  at issue.  The parties shall notify the Court immediately of such a

7  determination, and of any Federal Circuit ruling.  A case

8  management conference is scheduled for September 8, 2006 at 1:30

9  p.m., but this date may be continued by stipulation.

10

11      IT IS SO ORDERED.

12

13 Dated:  5/26/06

14                                    _____

15                                    CLAUDIA WILKEN
                                      United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

24